**UNITED STATES**

v.

**Staff Sergeant Tana R. TANNER,
United States Air Force.**

**ACM 33867.**

U.S. Air Force Court of Criminal Appeals.

Sentence Adjudged 29 July 1999.

Decided 16 Aug. 2000.

Appellate Counsel for Appellant: Major Marc A. Jones (argued), Colonel Jeanne M. Rueth, and Lieutenant Colonel James R. Wise.

Appellate Counsel for the United States: Major Bryan T. Wheeler (argued), Colonel Anthony P. Dattilo, and Lieutenant Colonel Ronald A. Rodgers.

Before YOUNG, Chief Judge, SPISAK, and SCHLEGEL, Senior Judges.

## OPINION OF THE COURT

YOUNG, Chief Judge:

Court members convicted the appellant of wrongfully using methamphetamine in 1998, but acquitted her of wrongfully possessing the same drug in 1994. Article 112a, UCMJ, 10 U.S.C. § 912a. The convening authority approved the adjudged sentence of a bad-conduct discharge and reduction to E–2. The appellant assigns three errors: (1) The military judge misapplied the rule of law established in *United States v. Campbell*, 50

M.J. 154 (1999) (*Campbell I*); (2) The military judge erred in finding that a certified technician performed the analysis of her urine; and (3) The evidence is legally and factually insufficient. We affirm.

## I. The Facts

On 12 November 1998, the appellant was randomly selected to provide a urine specimen for testing as part of the Air Force .Drug Testing Program. The appellant's urine specimen was collected and shipped off to the Air Force Drug Testing Laboratory (AFDTL), at Brooks Air Force Base, Texas, under chain of custody procedures. The tests revealed the presence of methamphetamine at a level of 725 nanograms per milliliter (ng/ml) of the appellant's urine. The AFDTL can confidently establish the presence of methamphetamine at a level of 75 ng/ml, but the Department of Defense (DoD) does not report such a specimen as positive unless it contains at least 500 ng/ml. The accused had not been prescribed any medication containing methamphetamine.

At trial, the prosecution presented evidence concerning the collection of the urine and the chain of custody procedures used to insure that the accused's specimen arrived at the laboratory in an unadulterated condition. Dr. Modak, a forensic toxicologist employed at the AFDTL, testified in detail about the operations of the AFDTL, to include security procedures and controls, chain of custody issues, certification of employees, and the blind proficiency testing programs. He also testified that methamphetamine was a synthetic drug not produced by the body, either naturally or as a result of the interaction of other lawful substances. Dr. Modak's testimony established that the specimen was tested using state of the art technology, gas chromatography/mass spectrometry (GC/MS), the DoD cutoff level of 500 ng/ml was set artificially high to exclude any reasonable possibility that incidental exposure to the drug would trigger a positive result, and that the testing methodology reliably detected the presence and reliably quantified the concentration of methamphetamine in the specimen. From examining the report of results, Dr. Modak concluded that the chain of custody was clean and that the appellant had in-gested methamphetamine 48 hours or so prior or to providing the specimen. He could not tell how much of the drug was used, the frequency of use by the appellant, when precisely the drug had been used, how it was ingested, whether it had been ingested knowingly, and whether it was reasonably likely that the appellant experienced the physical and psychological effects of the drug.

The defense vigorously cross-examined the prosecution's witnesses—especially with regards to the qualifications of the personnel employed at the lab and the inability of the prosecution to establish a reasonable likelihood that the appellant would have experienced the physical and psychological effects of the drug. The defense also challenged the veracity of the witness who testified that the appellant had possessed methamphetamine in 1994—the offense of which the appellant was acquitted. The appellant did not testify or present other evidence to suggest she unknowingly ingested the drug.

## II. Certification of the Laboratory Technician

■ During cross-examination of Dr. Modak, the defense counsel produced a document, Appellate Exhibit XI, that listed which laboratory tests and procedures Guy Montgomery, the technician who performed the GC/MS on the appellant's specimen, was certified to perform. The space for documenting certification for the GC/MS of methamphetamine was blank. Dr. Modak claimed Appellate Exhibit XI was actually a summary of Mr. Montgomery's certifications, and was not the actual certifying document. Dr. Modak was certain Mr. Montgomery had been certified.

At the close of the prosecution's case, the appellant moved for a finding of not guilty. Rule for Courts–Martial (R.C.M.) 917. As part of that motion, the defense counsel suggested the military judge should exclude the urinalysis results because there was a substantial violation of regulatory procedures designed to insure reliability of the testing procedures—Mr. Montgomery was not certified to perform the GC/MS analysis of a specimen for amphetamine or methamphetamine. *See United States v. Strozier*, 31 M.J. 283, 287 (C.M.A.1990). Relying on Dr.

Modak's testimony that Mr. Montgomery was certified, the military judge refused to grant the motion. Now on appeal, the defense claims the military judge's factual finding that Mr. Montgomery was certified to perform GC/MS testing was clearly erroneous. The defense asserts that the military judge should have suppressed the results because the government substantially violated regulations that insure the reliability of the testing procedures.

The military judge did not find that Mr. Montgomery was certified to perform GC/MS operations. He ruled that, viewing the evidence in the light most favorable to the government, there was sufficient evidence to establish each element of the offense charged. He left the question of certification to the members after carefully instructing them on the apparent discrepancy in his qualifications and how to evaluate it.

Motions to suppress evidence must be raised before the accused enters her plea. R.C.M. 905(b)(3). Absent a showing of good cause, failure to make such a request, shall constitute waiver. R.C.M. 905(e). It appears from the record that the very experienced defense counsel made a tactical decision not to move to suppress. To do so would have tipped his hand, provided Dr. Modak with an opportunity to consider how better to respond, and given the prosecution an opportunity to get the actual certification documents from the Brooks Lab. Instead, the defense counsel chose to get maximum effect by surprising the prosecution during the cross-examination of Dr. Modak in front of the court members. We think the defense approach was well-considered, although it obviously failed to win the day. However, by failing to move to suppress the evidence before the entry of pleas, the appellant waived suppression of the evidence.

### III. Instructions and Motion for Finding of Not Guilty

The appellant asserts that, by misapplying the law of *United States v. Campell,* the military judge erred in denying her motion for a finding of not guilty under R.C.M. 917 and in instructing the court members they could infer from the presence of metham-

phetamine in her urine that the appellant knowingly used the drug.

A military judge may grant a motion for a finding of not guilty if he concludes the evidence is legally insufficient. *See United States v. Griffith,* 27 M.J. 42 (C.M.A.1988) (interpreting R.C.M. 917). As this Court must evaluate the legal sufficiency of the evidence independent of any assessment made by the military judge, we need not determine whether the military judge erred in concluding the evidence was legally sufficient to go to the court panel. *See* R.C.M. 917(g). In addition, the instruction on the permissive inference is intertwined with the legal sufficiency question. If the evidence does not support the inference in this case, the evidence is legally insufficient to support a finding of guilty. Therefore, both of these questions will be answered in our discussion of the legal sufficiency issue.

### IV. Legal and Factual Sufficiency

The appellant asserts that the evidence is legally and factually insufficient to sustain her conviction because someone could have put a small amount of methamphetamine in ₐ a glass from which she drank, a large amount of ephedrine or pseudoephedrine could have caused the GC/MS to misread the amount of methamphetamine, the laboratory technician was not certified to perform the GC/MS analysis on her specimen, and the appellant did not experience the physical and psychological effects of methamphetamine.

We summarily reject all the appellant's averments except the final one. There is no evidence to suggest someone might have put methamphetamine in a glass from which appellant drank. The defense either does not understand or refuses to accept the evidence that ephedrine and pseudoephedrine could not have caused the positive urinalysis results in this case. We are also convinced the evidence was sufficient for rational court members to conclude that the laboratory technician was certified to perform his duties.

In proving the elements of any offense, the prosecution has two burdens: (1) the burden of producing evidence and (2) the

burden of persuasion. The prosecution must *produce* evidence that, when taken in the light most favorable to the prosecution would satisfy a rational factfinder beyond a reasonable doubt of the appellant's guilt. This is the test for legal sufficiency. 2 John W. Strong et al., *McCormick on Evidence* §§ 336, 338 (5th ed.1999). *See United States v. Turner,* 25 M.J. 324 (C.M.A.1987). The evidence produced by the government must *persuade* the particular factfinder beyond a reasonable doubt of the accused's guilt. 2 Strong, *supra,* § 341. This Court also has factfinding powers. Furthermore, after weighing the evidence, judging the credibility of witnesses, and determining controverted questions of fact, and recognizing that the trial court saw and heard the witnesses, this Court must be *persuaded* beyond a reasonable doubt of the accused's guilt. Article 66(c), UCMJ, 10 U.S.C. § 866(c); *Turner,* 25 M.J. at 325. This is the test for factual sufficiency.

■ The appellant was charged with wrongfully using methamphetamine. Although some trial judges continue to follow the four elements in the *Military Judges' Benchbook,* it is clear there are only two elements to this offense:

(1) That the accused used a controlled substance; and

(2) That her use was wrongful.

*United States v. Campbell,* 52 M.J. 386, 388 (2000) *(Campbell II)* (citing *Manual for Courts–Martial, United States (MCM),* Part IV, ¶ 37b(2) (1998 ed.)); *Campbell I,* 50 M.J. at 159. "Knowledge of the presence of the controlled substance is a required component of use." *MCM,* Part IV, ¶ 37c(10).

■ To prove the appellant had knowledge she was using a controlled substance, the prosecution relied in part upon a permissive inference established by the President: "Knowledge of the presence of the controlled substance may be inferred from the presence of the controlled substance in the accused's body or from other circumstantial evidence. This permissive inference may be legally sufficient to satisfy the government's burden of proof as to knowledge." *MCM,* Part IV, ¶ 37c(10).

In *Campbell I,* the CAAF announced a three-part standard which is required before the prosecution was entitled to the benefit of the knowledge inference.

The prosecution's expert testimony must show: (1) that the "metabolite" is "not naturally produced by the body" or any substance other than the drug in question; (2) that the cutoff level and reported concentration are high enough to reasonably discount the possibility of unknowing ingestion and to indicate a reasonable likelihood that the user at some time would have "experienced the physical and psychological effects of the drug"; and (3) that the testing methodology reliably detected the presence and reliably quantified the concentration of the drug or metabolite in the sample.

*Campbell I,* 50 M.J. at 160 (citations omitted).

In *Campbell II,* the CAAF attempted to clarify its holding in *Campbell I.*

In the present case, the deficiency was the absence of evidence establishing the frequency of error and margin of error in the testing process. Lacking such evidence, we held that the prosecution did not reliably establish that appellant's urine sample tested at or above the Department of Defense cut-off level and did not reasonably exclude the possibility of unknowing ingestion. Since the prosecution did not present any other direct or circumstantial evidence of knowing use, we held the evidence was legally insufficient to prove this element of the offense.

*Campbell II,* 52 M.J. at 388.

In this case, the prosecution's expert witness was unable to testify that there was a reasonable likelihood that the appellant experienced the physical and psychological effects of the drug. Thus, under *Campbell,* the urinalysis results standing alone in the appellant's case do not provide a rational basis for inferring knowing use. "If the test results, standing alone, do not provide a rational basis for inferring knowing use, then the prosecution must produce other direct or circumstantial evidence of knowing use in order to meet its burden of proof." *Id.*

During the trial, the prosecution presented two evidentiary matters that are circumstantial evidence of the appellant's knowledge. First, Staff Sergeant (SSgt) Reagan testified that, in December 1994, the appellant showed him a ziplock bag containing a grayish-white pebble which she described as crank—a street name for methamphetamine. She told him that she ingested it by crushing it and dissolving it in water because she did not like snorting it. Apparently, she used the crank to lose weight. However, the military judge instructed the court members that SSgt Reagan's testimony "as to how and why the accused would use methamphetamine" could only be used to prove the motive of the accused to possess methamphetamine in December of 1994. He further told the members to keep the evidence of the offenses separate and that proof of one offense carried no inference that the accused was guilty of any other offense. Based on the military judge's ruling, the court members could not have relied upon this evidence to support a finding that the appellant knowingly used methamphetamine in 1998. *See United States v. Morris,* 49 M.J. 227, 230 (1998).

The prosecution also introduced evidence of the circumstances surrounding the appellant's providing the urine specimen. Two witnesses testified that when the appellant arrived at the testing site, she appeared upset and restless—she was "shifting from side to side." She "kind of threw her ID card on the table and was continuously talking about the orderly room for whatever they had done to her." One of these two witnesses claimed that this was not unusual behavior for the appellant. An accused's demeanor while at the test site may be sufficient to show knowledge or at least consciousness of guilt. This evidence, taken in the light most favorable to the prosecution, is sufficient to permit the court members to infer the appellant knowingly used the methamphetamine. *Cf. County Court of Ulster County v. Allen,* 442 U.S. 140, 163–67, 99 S.Ct. 2213, 60 L.Ed.2d 777 (1979) (finding jury would have been reasonable in concluding that all occupants of motor vehicle exercised dominion and control over two handguns found in a handbag in the vehicle). The military judge properly instructed the members that the inference was permissive and they were not required to so infer. Based on the evidence before them, the court was not irrational in finding the appellant guilty beyond a reasonable doubt. We are also convinced of the appellant's guilt beyond a reasonable doubt.

The findings are correct in law and fact, and no error prejudicial to the substantial rights of the accused occurred. Accordingly, the findings and sentence are

AFFIRMED.

Senior Judge SPISAK and Senior Judge SCHLEGEL concur.